IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


RICHARD MATLAND,               )
                               )
            Plaintiff,         )
                               )
     v.                        )    No. 12 C 5165
                               )
LOYOLA UNIV. OF CHICAGO,       )
                               )
            Defendant.         )


MEMORANDUM OPINION AND ORDER

In this suit under the Americans with Disabilities Act
("ADA"), 42 U.S.C. §§ 12111 *et seq.*, Richard Matland ("Matland")
claims that Loyola University of Chicago ("Loyola") denied him a
reasonable accommodation and terminated his appointment as the
Helen Houlahan Rigali Professor of Political Science ("Rigali
Chair") because of his disability.  Loyola counters that Matland
(1) did not make a timely request for a reasonable accommodation
and (2) was not reappointed as the Rigali Chair because of his
thin record of publications.

The parties have filed cross motions for summary judgment.
I deny both motions for the reasons stated below.

I.

In 2005, Loyola formed a search committee to fill the newly
created Rigali Chair in political science.  Matland was a tenured
professor at the University of Houston when he applied for a five

year renewable term as the Rigali Chair at Loyola.  After

attempting to negotiate a guarantee of two terms, Matland signed

an offer letter that contained the following language about the

standards for reappointment:

> Criteria to determine possible reappointment as the
> Rigali Professor may include a sustained record of
> excellence in research and teaching, continued
> recognition for a record of excellence in research and
> scholarship internal and external to the University,
> and an ongoing contribution to your field of learning
> and to the University.

Def.'s Ex. A-5.

Matland began his appointment as the Rigali Chair during the

2006-2007 academic year.  After experiencing severe respiratory

problems, Matland was diagnosed with an interstitial lung disease

in May 2007 and advised that he may need a lung transplant.

Pl.'s Statement of Facts ("PSOF") at ¶ 15.  He started a four to

six month course of chemotherapy during the fall semester in

2007.  *Id*. at ¶ 17.  Matland carried an oxygen tank around campus

during his tenure as the Rigali Chair and had a noticeable cough.

*Id*. at ¶¶ 19, 38.

Matland disclosed his lung condition to Claudio Katz, Chair

of the Political Science Department from 2003 to 2008, on two

occasions.  In the fall of 2007, Matland told Katz he had been

diagnosed with an autoimmune disease for which he was taking

steroids and being considered for a lung transplant.  Def.'s

Statement of Facts ("DSOF") at ¶ 60.  Katz asked Matland whether

he needed to take a medical leave of absence. *Id*. Matland told
Katz he could continue working given that he only needed to be in
the classroom for three hours each week. *Id*. The next time
Matland mentioned his health to Katz was during his annual
assessment in January 2008. In his written self-assessment,
Matland stated that his lung condition prevented him meeting his
publishing goals in 2007. *Id*.

Matland's most significant accomplishment as the Rigali
Chair was securing a $375,000 grant from the National Science
Foundation ("NSF") in 2008 to research "Women Candidates in
Regional Russia." *Id*. at ¶ 19. The parties dispute how many
publications Matland prepared during his tenure as the Rigali
Chair. *Compare* Def.'s SOF at ¶¶ 22-25 *with* Pl.'s Resp. to Def.'s
SOF at ¶¶ 38-39. However, it is undisputed that Loyola rated
Matland as meeting or exceeding its expectations with regard to
"scholarship" in its annual assessments for each year from 2006
to 2010. *See* Def.'s Exs. A-14 to A-18.

In May 2010, Provost John Pelissero ("Provost Pelissero")
sent Matland a letter explaining the five year review process for
endowed chairs. Pelissero's letter referred to a "Protocol
Document" that was in effect when Matland assumed the Rigali
Chair in July 2006:

> [E]very five years the university shall conduct a
> summative evaluation of the person's accumulated
> contributions and achievements. The process used shall

be parallel to the process for promotion to full
professor...[A] faculty member who has made
consistently excellent contributions in scholarship,
teaching, and service may be recommended to enjoy
another five year term as the holder of the endowed
chair or endowed professorship.

Def.'s Ex. A-7. In August 2010, Francis Fennell, Dean of the

College of Arts and Sciences ("Dean Fennell"), sent Matland a

follow up letter indicating that Loyola would *not* consider any

activities or accomplishments preceding his installation as the

Rigali Chair during the review process.[1] Def.'s Ex. A-10.

In August 2010, Matland submitted a report of his activities

and accomplishments as the Rigali Chair. The second full

paragraph of Matland's report described his illness:

While I have actively worked at reaching these goals
and establishing myself at Loyola, I also have had to
deal with a serious and debilitating auto-immune
disease that has attacked my lungs...For long periods
of time I have gone through chemotherapy, extremely
heavy doses of steroids resulting in only two [to]
three hours of sleep a night, and switching from drug
to drug to drug trying to find something that worked
effectively without debilitating side effects. I have
been in the hospital every year since coming to
Loyola...My condition fluctuates, but presently is
stable. This requires, however, a high dosage of
immuno-suppressants that have a variety of negative
side effects...Nevertheless, I have worked hard at
fulfilling my obligations and I believe I have [done]
so in a satisfactory manner.

---

[1] Matland continues to argue that Loyola assured him during the
recruitment process that his entire record would be considered
during the Rigali Chair review, but I have already dismissed his
promissory estoppel and fraudulent misrepresentation claims. *See
Matland v. Loyola Univ. of Chicago*, No. 12 C 5165, 2012 WL
5949067 (N.D. Ill. Nov. 27, 2012).

Def.'s Ex. A-11.

Loyola distributed Matland's renewal application, including the narrative quoted above, to four external reviewers before starting its internal review process. PSOF at ¶ 27. All four external reviewers recommended renewing Matland's appointment as the Rigali Chair. *Id.* at ¶ 28. Reviewer B described Matland's publication record from 2006 to 2010 as "thin," but noted that he has been "grievously ill for four years." Def.'s Ex. I-1. She concluded, "I don't think you need an outside reviewer to tell you that this has posed a major impediment to [Matland] continuing to publish at the same rate he did before." *Id.* Reviewer D also commented that Matland had "faced major health problems of a truly frightening sort that have undoubtedly cut into his research activity." *Id.*

The first layer of Loyola's internal review process was a committee consisting of all full professors in the Political Science Department. PSOF. at ¶ 24. After reading Matland's submission and the external reviews, a committee member inquired whether it would be permissible to postpone the Rigali Chair review process for a year or two because of Matland's illness. Pl.'s Ex. 6. Vincent Mahler ("Mahler"), the new Chair of the Political Science Department, asked Dean Fennell whether Matland's health should factor into the committee's decision in any way. *Id.* Fennell questioned the "appropriateness" of

Matland's narrative about his illness and agreed with Mahler that the departmental committee should make its decision based strictly on academic merit. *Id.* On November 8, 2010, the Political Science Department committee voted six to three against reappointing Matland to the Rigali Chair based on his "very poor publication record" and skepticism about whether his NSF-funded research would result in publications. DSOF at ¶ 42.

Department Chair Mahler performed the next layer of internal review and completed his report on November 15, 2010. After acknowledging Matland's "strong record of grantsmanship," Mahler concurred with the departmental committee's recommendation to terminate Matland's appointment as the Rigali Chair because of his thin record of publications from 2006 to 2010. *Id.* at ¶ 43. A majority of the Rank, Tenure, and Leave Committee in the College of Arts and Sciences reached the same conclusion by vote of six to one and submitted its recommendation to Dean Fennell on November 22, 2010.[2] *Id.* at ¶ 44.

Dean Fennell completed his own review on November 30, 2010 and concurred that Matland should not be reappointed as the Rigali Chair. Pl.'s Ex. 16. Unlike previous internal reviewers,

---

[2] The college-level committee noted the "vague[ness]" of the Protocol Document and wondered whether five years was not enough time to evaluate work that is high-risk or long-term in nature. Def.'s Ex. G.

who did not factor Matland's illness into their recommendations,

Dean Fennell's report included the following commentary:

> [I] need to address the most salient argument made for
> his retention [as the Rigali Chair], the one made by
> his external reviewers and the minority of his
> department committee: namely, that Dr. Matland's
> decline in productivity is owing directly to his
> ongoing illness.  He should not be "punished," as it
> were, for a very unfortunate circumstance over which he
> has no control.  I asked the department not to evaluate
> the effect of his illness, since that lies outside its
> area of competence.  But illness is clearly a major
> factor, and Dr. Matland's raising of it in the very
> first paragraph of his memo requires that I acknowledge
> the issue in explaining my recommendation.
>
> Here's how [I] view it, and I will argue by analogy.
> Suppose a star major league baseball player signs a
> multi-million dollar five year contract.   Further
> suppose that two years into the contract the player
> sustains, through no fault of his own, a career-ending
> injury.  Certainly the team is obliged to still pay him
> until the end of his contract--presumably his agent put
> in language to that effect.  But when the five years
> are up, is the team obliged to offer him a new five
> year contract when he can no longer play the game at
> the major league level?  Clearly not.  The same would
> be true here, in my view: nowhere does Dr. Matland
> claim his illness is going to ameliorate, that renewed
> high productivity can be expected.  So I do not see an
> injustice in passing the responsibilities of the Rigali
> professorship on to someone else.

*Id*.  Dean Fennell did not ask Matland about his prognosis during

the Rigali Chair review process because he thought doing so would

have been inappropriate.  PSOF at ¶ 41.

The University Rank and Tenure ("URT") Committee performed

the final layer of internal review before Provost Pelissero

decided whether to renew Matland's appointment as the Rigali

7

Chair.  On January 12, 2011, the URT committee concluded that Matland's "record of scholarship does not meet the expectations of someone in such a prestigious position."  Def.'s Ex. H-1.

After reviewing Matland's submission, the external reviewer's comments, and all internal recommendations, Provost Pelissero informed Matland on January 26, 2011 that he would not be reappointed as the Rigali Chair in political science, "primarily due to a low record of published scholarship."  Def.'s Ex. A-22.

On March 29, 2011, Matland appealed Provost Pelissero's decision, arguing, *inter alia*, that the decision not to renew his appointment as the Rigali Chair constituted discrimination based on his disability: "Despite my clear signaling that my health had been a problem, at no point did [Loyola's internal reviewers] request any information and at no point, as far as I can tell, was there any consideration that my health may have delayed some of my productivity."  Def.'s Ex. A-23 at 5.  "Surely if any concession is made for the fact that moving and illness has slowed my production, and any reasonable attempt is made to make a prediction of pay off in the future, the record is more than enough to deserve reappointment."  *Id*. at 10.

The Faculty Appeals Committee ("FAC") held a hearing on Matland's appeal in September 2011.  After gathering evidence and hearing testimony, the FAC "found no evidence that Dr. Matland

formally requested any accommodations due to his illness with regard to his research productivity." Def.'s Ex. A-24 at 2. The FAC noted that Dean Fennell, "in consultation with the Provost," was the only internal reviewer who considered Matland's illness in making his recommendation. *Id.* at 2-3. Ultimately, because "Dr. Matland's illness was addressed inconsistently across the review process," the FAC recommended that Loyola should vacate Provost Pelissero's decision and assess "how to consider Dr. Matland's illness in light of the [ADA] and similar laws." *Id.* at 1.

Loyola's President, Father Michael Garanzini ("Father Garanzini"), reviewed Matland's appeal and the FAC's recommendation. DSOF at ¶ 55. After consulting with counsel, Father Garanzini upheld Provost Pelissero's decision not to renew Matland's appointment as the Rigali Chair based on his view that the ADA did not require Loyola to grant Matland's "retroactive request for an accommodation that would now excuse [him] from fulfilling an essential function of [his] appointment." Def.'s Ex. F at 4.

Matland's tenure as the Rigali Chair expired in June 2011. DSOF at ¶ 56. He remains a tenured professor of political science at Loyola. *Id.*

II.

The parties have filed cross motions for summary judgment on Matland's claims that Loyola (1) denied him a reasonable accommodation and (2) terminated his appointment as the Rigali Chair because of his disability.

Summary judgment is appropriate where the movant "show[s] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The ADA identifies which facts are "material" because they "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In ruling on cross motions, I must "construe all inferences in favor of the party against whom [each] motion under consideration is made." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998).

A.

1.

Matland's first claim alleges a violation of the ADA's reasonable accommodation mandate. *See* 42 U.S.C. § 12112(b)(5)(A). An employee's initial duty to make his limitations "known" to his employer "requires at most that [he] indicate... that [he] has a disability and desires an

accommodation." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 803 (7th Cir. 2005). The employee need not use the word "accommodation" or any other magic words when making a request. *See Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996).[3] Once a request for accommodation is made, "the employer and the employee must work together through an 'interactive process' to determine the extent of the disability and what accommodations are appropriate and available." *Sears*, 417 F.3d at 804.

Here, Loyola seeks summary judgment on Matland's failure to accommodate claim on two grounds: (1) Matland failed to request an accommodation or otherwise trigger Loyola's duty to engage in the interactive process *before* Provost Pelissero decided not to renew his appointment as the Rigali Chair and (2) to the extent Matland requested a reasonable accommodation when appealing Provost Pelissero's decision, the ADA does not require employers to grant "do-overs" or second chances. In short, Loyola argues that Matland's requests were either too ambiguous or "too little, too late."

---

[3] Loyola relies on *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894 (7th Cir. 2000), for the proposition that an employee must "assert not only a disability, but also any limitation[s] resulting therefrom." *Id.* at 898 (quoting *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996)). The *Jovanovic* court noted that the Seventh Circuit "has never adopted the triggering requirement in *Taylor*" and did not rest its decision on the employee's failure to request an accommodation. *Id.* at 898-99.

As a preliminary matter, Matland's disability was or should have been obvious to Loyola given that he carried an oxygen tank around campus. *See Hedberg v. Ind. Bell Tele. Co, Inc.*, 47 F.3d 928, 934 (7th Cir. 1995) ("[S]ome symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability."). Matland also explained to the chair of his department in January 2008 that his illness had slowed his progress on preparing publications. Thus, the work-related limitations resulting from Matland's disability were at least partially known to Loyola well before Matland applied for renewal of the Rigali Chair in August 2010.

A reasonable jury could find that Matland's renewal application included a request for accommodation sufficient to trigger Loyola's duty to engage in the interactive process. In the second full paragraph of his application, Matland described his illness as "debilitating" and his treatment regimen as a "hassle" that required "a tremendous amount of both psychic energy and time." Def.'s Ex. A-11. Upon reading this narrative, two external reviewers noted the connection between Matland's illness and his diminished scholarly output. They recommended, in effect, that Loyola should renew Matland's appointment as the Rigali Chair as a form of reasonable accommodation. A member of the Political Science Department committee also inquired whether

it would be permissible to postpone the Rigali Chair review for a year or two as a form of reasonable accommodation.  In light of these facts, a jury could easily find that Matland requested a reasonable accommodation, and was regarded as having done so until Dean Fennell instructed Loyola's internal reviewers to base their recommendation strictly on academic merit.

Loyola argues that Matland's narrative cannot be construed as a request for accommodation because Matland asserted that he had "fulfill[ed] [his] obligations...in a satisfactory manner." Def.'s Ex. A-11.  This argument has no merit.  Matland's application does not establish that he wanted Loyola to evaluate him without considering reasonable accommodations, even if that meant losing the Rigali Chair.  To the extent Matland's assessment of his own performance created ambiguity about whether he was seeking an accommodation, Loyola had a duty to inquire. "Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification." *Sears,* 417 F.3d at 804; *see also Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000) (employer's duty to engage in interactive process includes an "affirmative obligation to seek [employee] out and work with [him] to craft a reasonable

13

accommodation, if possible").[4]  Loyola's unilateral decision to
interpret Matland's narrative about his illness as extraneous
information--rather than a request for accommodation--is not
entitled to deference under the ADA.

In sum, a reasonable jury could find that Matland's
application for reappointment as the Rigali Chair included a
timely request for a reasonable accommodation.  Accordingly, I
need not decide whether Matland's appeal was "too little, too
late" in the sense that he was requesting a "do-over" or second
chance.  *See Siefken v. Village of Arlington Heights*, 65 F.3d
664, 666-67 (7th Cir. 1995) (holding that terminated employee's
request for a "second chance" to control his diabetes did not
fall within ADA's definition of "reasonable accommodation").

Loyola's motion for summary judgment on Matland's failure to
accommodate claim is denied.

2.

Matland's second ADA claim alleges that Loyola terminated
his appointment as the Rigali Chair because of his disability.[5]

---

[4] Loyola has not cited any cases supporting its argument that
engaging in the interactive process when an employee's request
for accommodation is ambiguous may expose the employer to
liability for "regarding" the employee as disabled.  *See* 42
U.S.C. § 12102(3).

[5] Loyola's argument that its decision to terminate Matland's
appointment as the Rigali Chair is an academic judgment entitled
to deference misses the point.  Matland's claim is that Loyola's
decision was *not* a purely academic judgment as evidenced by Dean
Fennell's memo comparing him to an athlete who has suffered a
career ending injury.

At the summary judgment stage, Matland must present evidence that would permit a reasonable jury to find that his disability was a "but for" cause of his termination. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010)).

Loyola contends that Matland cannot survive summary judgment under the "direct" or "indirect" method of proving intentional discrimination. "[D]irect proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (e.g., 'You're too [disabled] to work here.'), but also includes circumstantial evidence which suggests discrimination albeit through a longer chain of inferences." *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006). "The focus of the direct method of proof...is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence points directly to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotation omitted). In contrast, under the "indirect method," an employee "can raise the inference of discrimination by identifying a similarly situated employee outside the protected class who was treated more favorably by the employer." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 588 (7th Cir. 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Dean Fennell's memo comparing Matland to a baseball player who has suffered a career ending injury contains direct evidence that Matland's disability was a "but for" cause of Loyola's decision to terminate his appointment as the Rigali Chair.[6]  In response to Mahler's inquiry about whether the Political Science Department committee should consider Matland's disability, Dean Fennell posed the following questions:

> If one thinks the last [five] years is not okay, but is explainable by the illness, then one has to decide about the future: [W]ill the illness lift, so that one is optimistic the next [five] years will be better? [O]r will it likely not lift, in which case where does that leave us in terms of what we expect/need from that chairholder?

Pl.'s Ex. 6.  After consulting with Provost Pelissero, Loyola's final decision-maker,[7] Dean Fennell made the following assumption about Matland's prognosis: "[N]owhere does Dr. Matland claim his illness is going to ameliorate [or] that renewed high productivity can be expected.  So I do not see an injustice in

---

[6] Loyola's argument that Dean Fennell's memo does not express his personal views about Matland's disability is contradicted by Dean Fennell's own words: "Here's how [I] view it, and I will argue by analogy."  Def.'s Ex. A-21 at 3.

[7] Fennell's consultation with Pelissero, the final decision-maker in the Rigali Chair review process, makes it unnecessary for Matland to rely on the "cat's paw" theory of employer liability. *See Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1194 (2011) ("[I]f a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." (emphasis in original)).  In any event, Pelisssero's independent review of Matland's application does not automatically preclude employer liability under the cat's paw theory.  *See id*. at 1193.

passing the responsibilities of the Rigali professorship on to someone else."  Def.'s Ex. A-21 at 3.

If Loyola wanted more information Matland's prognosis, it could have engaged in the interactive process to "identify the precise limitations resulting from [his] disability."  29 C.F.R. § 1630.2(o)(3).  Instead, Dean Fennell assumed that Matland's illness would remain a drag on his scholarly output and based his recommendation on this assumption.  A reasonable jury could find that under Dean Fennell's own reasoning, but for his assumption about Matland's prognosis, he would have recommended renewing his appointment as the Rigali Chair.  Accordingly, Loyola's motion for summary judgment on Matland's disparate treatment claim is denied.

### B.

I turn now to Matland's cross motion for summary judgment on his two ADA claims.

### 1.

Matland seeks summary judgment on his reasonable accommodation claim based on Loyola's failure to engage in the interactive process.  Summary judgment may not be granted on this basis.  "The interactive process the ADA foresees is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought."

*Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1023 (7th Cir. 1997). Accordingly, "it is not sufficient for [Matland] to show that [Loyola] failed to engage in an interactive process or that it caused the interactive process to break down." *Rehling v. City of Chicago*, 207 F.3d 1009, 1016-17 (7th Cir. 2000).

The statutory framework for Matland's reasonable accommodation claim remains the same notwithstanding Loyola's failure to engage in the interactive process: "To establish a claim for failure to accommodate, [Matland] must show that: (1) [he] is a qualified individual with a disability; (2) the employer was aware of [his] disability; and (3) the employer failed to reasonably accommodate the disability." *Sears*, 417 F.3d at 797. Matland is "qualified" under the ADA only if he could "perform the essential functions" of the Rigali Chair with or without a reasonable accommodation. 42 U.S.C. § 12111(8). A desired accommodation is unreasonable when it would require the employer to eliminate or reallocate an essential job function. *See Peters v. City of Mauston*, 311 F.3d 835, 846 (7th Cir. 2002).

Here, Loyola has raised a genuine issue of material fact about the extent to which publishing was an "essential function" of the Rigali Chair. Loyola, citing its Protocol Document, contends that Matland was required to produce a body of scholarship from July 2006 to August 2010 that would have been sufficient to earn tenure because the endowed chair renewal

18

process is "parallel" to tenure review.[8]  To the extent Matland
sought a "concession" in Loyola's expectation for scholarly
output, Loyola argues that publishing at a tenure-worthy rate is
an "essential function" of holding an endowed chair.

Matland counters with evidence that Loyola granted one of
his colleagues, Endowed Chair E, a one year extension of the five
year review process in 2011 and later renewed his appointment
without a full, multi-layer review process.  The work experience
of other endowed chairs is relevant in determining the essential
functions of the Rigali Chair.  *See Miller v. Ill. Dept. of
Transportation*, 643 F.3d 190, 198 (7th Cir. 2011) (employer's
judgment about which job functions are essential "is not
controlling" because courts may "also look to evidence of the
employer's actual practices in the workplace" (citing 29 C.F.R. §
1630.2(n)(3)(vi)-(vii)).  In fact, Loyola comes close to
admitting that producing a tenure-worthy body of scholarship
between 2006 and 2010 was not an essential function of the Rigali
Chair: "If Matland had asked for more time at any point before he
was denied reappointment, it is possible, even likely, that
Loyola would have given him more time."  Dkt. No. 46 at 14.

---

[8] In rejecting Matland's contention that the Dean of the Graduate
School should have participated in the Rigali Chair review if the
process is truly "parallel" to tenure review, Father Garanzini
commented that "the process for evaluation of an endowed chair is
to be 'parallel' to the process for promotion to full professor--
*there is no requirement that it be identical*."  Def.'s Ex. F at 3
(emphasis added).

Loyola's apparent willingness to postpone the Rigali Chair review suggests that its expectations regarding scholarly output were, in fact, flexible.

The bottom line is that a genuine dispute exists over the essential functions of the Rigali Chair and, by extension, whether Matland is a "qualified individual" with a disability under the ADA. Therefore, Matland's motion for summary judgment on his failure to accommodate claim is denied.

2.

Matland's disparate treatment claim also turns on whether he is a "qualified individual" who could perform the "essential functions" of the Rigali Chair with or without a reasonable accommodation. *See Hoppe v. Lewis Univ*., 692 F.3d 833, 838-39 (7th Cir. 2012) (stating elements of ADA disparate treatment claim). Summary judgment for Matland is inappropriate given the genuine dispute about the extent to which publishing at a tenure-worthy rate between 2006 and 2010 was an essential function of the Rigali Chair position.

III.

The parties' cross motions for summary judgment are DENIED for the reasons stated above.

**ENTER ORDER:**

_Elaine E. Bucklo_
Elaine E. Bucklo
United States District Judge


Dated: October 28, 2013